## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:19-cr-00184-JAW |
| | ) | |
| PRANEETH MANUBOLU | ) | |

### ORDER ON MOTION TO SUPPRESS

In the early morning hours, an allegedly intoxicated individual crashed his car within a national park, killing his three passengers. Without first obtaining a warrant, a police officer from a nearby town ordered and oversaw a blood draw from the driver pursuant to a state law mandating that drivers submit to a blood draw if there is probable cause to believe that a motor vehicle accident has resulted will result in death. The defendant-driver seeks to suppress the results of that blood draw, arguing that it was taken in violation of 36 C.F.R. § 4.23(c)(3) and his Fourth Amendment rights under the United States Constitution.

Because the Court concludes that the mandatory blood draw was unconstitutional, and because the Court further finds that there were no exigent circumstances and the good-faith exception does not apply to the officer's conduct, the Court grants the motion and suppresses the blood draw.

## I.   BACKGROUND

### A.   Procedural Background

On August 31, 2019, United States Park Ranger Brian Dominy (Ranger Dominy) swore out a three-count complaint against Praneeth Manubolu, charging him with three violations of 18 U.S.C. §§ 7 and 13, as well as 17-A M.R.S. 203(1)(A).

*Compl.* (ECF No. 1).  On October 9, 2019, a grand jury returned a six-count indictment against Mr. Manubolu, charging him with three violations of 18 U.S.C. § 1112(a), a violation of 36 C.F.R. § 4.23(a)(1), a violation of 36 C.F.R. § 4.23(a)(2), and a violation of 36 C.F.R. § 4.22(b)(1).  *Indictment* (ECF No. 29).  On October 31, Mr. Manubolu filed a motion to suppress a blood draw conducted at a local hospital upon the order of police officers.  *Def.'s Mot. to Suppress* (ECF No. 40) (*Def.'s Mot.*).  On December 9, 2019, the Government responded.  *Gov't Resp. to Def.'s Mot. to Suppress* (ECF No. 44) (*Gov't Resp.*).  Mr. Manubolu replied to the Government on December 23, 2019. *Def.'s Reply to Gov't Resp. to Def.'s Mot. to Suppress* (ECF No. 45) (*Def.'s Reply*).

On January 2, 2020, the Court held a conference with counsel to discuss the pending motion to suppress.  *Min. Entry* (ECF No. 47).  The Court noted that the hospital where police brought Mr. Manubolu had conducted its own blood test of Mr. Manubolu for medical purposes.  Assuming this second blood test did not pose the same Fourth Amendment concerns as the first test, the Court asked counsel to determine whether they wished the Court to move forward with the motion to suppress or whether the better course would be to first test the admissibility of the second blood test.

On January 10, 2020, counsel for Mr. Manubolu informed the Court that Mr. Manubolu had elected to proceed with a hearing on the pending motion to suppress. *Letter from Att'y McKee to Clerk of Court for the United States District Court for the District of Maine* (ECF No. 48).  On January 13, 2020, the Court scheduled a hearing on the motion to suppress. *Notice of Hr'g on Mot.* (ECF No. 49).  On February 6, 2020,

counsel for Mr. Manubolu informed the Court of additional authority relevant to his motion to suppress. *Letter from Att'y McKee to Clerk of Court for the United States District Court for the District of Maine* (ECF No. 50).

On March 2, 2020, the Court held a hearing on the motion to suppress. *Min. Entry* (ECF No. 53). At the conclusion of the hearing, the Court informed the parties that it believed the doctrine of constitutional avoidance cautioned in favor of resolving the admissibility of the second blood test before reaching the motion to suppress. *Tr. of Proceedings* at 130:25-132:24 (ECF No. 57) (*Suppression Hr'g*). On March 13, 2020, the Court held a second conference of counsel at which counsel for both parties convinced the Court that, no matter the resolution of a motion in limine on the second blood test, the Court would still need to address the merits of Mr. Manubolu's motion to suppress. *Min. Entry* (ECF No. 56). On April 15, 2020, the court reporter filed the official transcript of the suppression hearing. *Suppression Hr'g*.

### B.    Factual Findings

#### 1.    A Car Crash in Acadia National Park

At approximately 2:48 a.m. on August 31, 2019, Bar Harbor Police Department (BHPD) Officer Judson Cake (Officer Cake) received a call from dispatch informing him of a motor vehicle crash on Park Loop Road in Acadia National Park (Acadia). *Suppression Hr'g* at 4:16-17, 5:01, 7:21-8:14.[1]  Because the rangers in Acadia stop working at midnight at that time of year, BHPD has a memorandum of understanding with the park to respond to calls from the park during the rangers'

---

[1]    Where a fact was revealed on direct examination and then reaffirmed on cross examination or by another witness, the Court did not make parallel record citations except where necessary.

off-hours.[2]  *Id.* at 08:17-23, 104:19-23.  Officer Cake drove to the scene of the crash, arriving at approximately 2:56 a.m.  *Id.* at 08:15-16, 08:24-09:13.

When Officer Cake arrived at the scene, he observed a badly damaged car in the woods on the right side of the road and a man—Mr. Manubolu—standing on the side of the road.  *Id.* at 09:16-18, 10:01-05.  Officer Cake spoke briefly with Mr. Manubolu but, upon realizing that the crashed car contained passengers, went to the car to see if he could render aid.  *Id.* at 10:06-19.  At this point, around 3:00 a.m., two additional BHPD officers—Officer Jerrod Hardy (Officer Hardy) and Officer Liam Harrington (Officer Harrington)—arrived at the scene.  *Id.* at 11:14-25, 57:21. Officer Hardy attempted to reach the passengers in the back of the car but was unsuccessful.  *Id.* at 12:03-04, 63:13-64:14.  Officer Harrington and Officer Hardy then assisted Officer Cake in removing the passenger in the front of the car and the two carried her to the side of the road, where Officer Harrington administered CPR until the arrival of an ambulance at approximately 3:12 a.m.  *Id.* at 12:14-13:01; 65:13-25.

While Officer Harrington was administering CPR, Officer Hardy went to Mr. Manubolu to address his injuries.  *Id.* at 66:01-04.  Officer Hardy observed that Mr. Manubolu had a goose egg-sized bump underneath his right eye and some cuts and scrapes on his face and arms.  *Id.* at 66:05-08.  At this point, to Officer Hardy's knowledge, all three passengers in the car were dead.  *Id.* at 66:16-17.

---

[2]      Only three rangers live on Mt. Desert Island and can provide immediate after-hours responses. *Id.* at 105:11-18.

### 2.  An Ambulance Arrives

When the ambulance arrived at approximately 3:12 a.m. with three Emergency Medical Technicians (EMTs), Officer Hardy was speaking with Mr. Manubolu and Officer Cake was taking photographs of the scene before it was contaminated by additional people.  *Id.* at 12:24-13:13, 68:01-07, 90:20-22.  The two also made additional attempts to retrieve the passengers from the back of the car.  *Id.* at 13:14-19.  In addition to the ambulance, the Southwest Harbor Police Department sent an officer to block Park Loop Road from other drivers; Ranger Dominy also arrived on scene at approximately 3:30 a.m.  *Id.* at 13:20-14:04, 22:08-19, 105:22-25.  BHPD had called Ranger Dominy at approximately 3:07 a.m. after having first contacted Deputy Chief Ranger Therese Picard, who requested that Ranger Dominy respond.  *Id.* at 104:08-18.

When they arrived, the EMTs asked Mr. Manubolu to accompany them into the ambulance so they could address his injuries.  *Id.* at 68:18-23.  Mr. Manubolu consented but also requested that Officer Hardy join him in the ambulance so that they could continue their conversation, which Officer Hardy did.  *Id.* at 68:24-69:04. In the ambulance, Mr. Manubolu related to Officer Hardy the events of that evening: he and his friends left their campsite at Smuggler's Den and went out for dinner at the Dog & Pony Tavern, where he had two shots of whiskey, before attending the Carmen Veranda dance club and stargazing.  *Id.* at 69:15-70:16.  Throughout this conversation, Mr. Manubolu repeatedly expressed concern for his friends.  *Id.* at 70:17-23.  It was during this conversation in the ambulance that Officer Hardy began

to notice the odor of alcohol coming off of Mr. Manubolu, as well as the fact that his eyes were bloodshot. *Id.* at 70:02-06. Though the EMTs asked Mr. Manubolu to go to the hospital, he initially did not want to go, and only agreed once he had extracted an agreement from Officer Hardy that Officer Hardy would accompany him. *Id.* at 70:21-71:03.

When Ranger Dominy arrived, he was met by the chief of the Bar Harbor Fire Department, who informed him there were three fatalities associated with the accident. *Id.* at 106:16-20. Officer Cake spoke with Ranger Dominy and informed him of the chronology of Mr. Manubolu's evening as he knew it. *Id.* at 106:25-107:22. The two determined that the Acadia rangers, not the town police, would take charge of the documentation of the crash scene, though Ranger Dominy was the only ranger on the scene for a long period and required the assistance of the BHPD officers.[3] *Id.* at 14:05-20, 108:08-18. At this point, it was not clear to Officer Cake that any resulting prosecution would be federal, although before Ranger Dominy arrived, Officer Cake said to Officer Hardy something to the effect that because the accident had happened in Acadia, it was "their baby . . .." *Id.* at 16:10-14, 24:19-25:02. That did not become clear to Officer Cake until his supervisor, Lieutenant Pinkham, arrived on the scene, sometime after 3:16 a.m. *Id.* at 16:15-23.

---

[3]     Given the traumatic nature of the accident, it is not surprising that whether Acadia formally took the lead in the investigation or it remained a joint investigation, as well as the length of time before the lead responsibility issue was resolved are a bit murky. It does not matter for purposes of resolving this motion to suppress. The rangers from Acadia worked with the police from the town of Bar Harbor to investigate the accident and ultimately Acadia took the lead in the investigation.

Before the ambulance transported Mr. Manubolu to the hospital, Officer Hardy stepped out of the ambulance to meet with Ranger Dominy to advise him that he— Officer Hardy—was with the driver of the vehicle, to tell him that he had observed indicators of impairment,[4] and to pass on some statements from Mr. Manubolu.  *Id.* at 71:04-16.  Officer Hardy passed this information along because he regarded Ranger Dominy as essentially the incident commander, as he believed the case would most likely be handled by Ranger Dominy.  *Id.* at 71:17-21.  Officer Hardy and Ranger Dominy agreed that Officer Hardy would go with Mr. Manubolu to the hospital to obtain a blood draw and that Ranger Dominy would remain on scene to wait for other rangers to respond.  *Id.* at 71:25-72:08.  Ranger Dominy did not discuss getting either a state or federal search warrant with Officer Hardy.  *Id.* at 87:06-13.  Officer Hardy did not ask Ranger Dominy whether state or federal law applied.  *Id.* at 95:03-15.  Ranger Dominy told Officer Hardy that he had authority under Maine law to take a blood sample and that until it was determined whether the prosecution would be federal or state, he should follow his normal procedures.  *Id.* at 110:09-18.

During this time, Officer Cake—who is a certified drug recognition expert— observed that Mr. Manubolu had bloodshot eyes and his breath smelled of alcohol; Officer Cake told both Officer Hardy and Ranger Dominy of these observations.  *Id.*

---

[4]     The indications of impairment that Officer Hardy noted included the odor of alcohol, bloodshot eyes, Mr. Manubolu's admission to consuming alcohol, Mr. Manubolu's failure to maintain his vehicle on a twenty-five mile per hour road, and the seriousness of the crash.  *Id.* at 93:12-19.  Officer Hardy did not note any additional signs of impairment and did not note slurred speech.  *Id.* at 93:20-25. Officer Hardy did not perform a horizontal gaze nystagmus test or any other standardized field sobriety test on Mr. Manubolu.  *Id.* at 94:01-07.  Officer Hardy says that given Mr. Manubolu's head injury, this was not likely a situation where he would perform a horizontal gaze nystagmus test.  *Id.* at 94:03-04.

at 05:24-07:20, 14:21-15:05. Officer Hardy informed Officer Cake that he had made the same observations. *Id.* at 15:06-12. After Ranger Dominy called the USAO, at around 4:00 or 4:30 a.m., Officer Cake reached out to Matt Foster (DA Foster), the district attorney for Hancock County, and, when he did not answer, left a voicemail message. *Id.* at 15:13-20, 26:09-14. At the point Officer Cake called DA Foster, he stated that the call was only a courtesy call, as the decision had already been made that the case would be prosecuted by the USAO.[5] *Id.* at 26:15-23. According to Officer Hardy, it is state law and BHPD policy to contact the district attorney in the event of a fatal crash. *Id.* at 76:23-77:03.

Officer Cake does not have a portable breathalyzer in his cruiser; he said this is because no one uses breathalyzers in Maine except for bail violations. *Id.* at 19:07-12. He stated that he did not consider having Mr. Manubolu submit to a breathalyzer test at the BHPD office because Officer Hardy had taken charge of Mr. Manubolu and was with him in the ambulance. *Id.* at 19:13-17. Officer Cake was more concerned with securing the scene of the accident. *Id.* at 19:17-22. Officer Cake noted that Mr. Manubolu had some cuts on his head, but he did not seem too beaten up by the accident; however, it was Officer Cake's opinion that Mr. Manubolu should go to the hospital to be looked at. *Id.* at 20:01-11.

Officer Hardy stated that he did not consider administering a breath test to Mr. Manubolu because he had indications of head trauma and the EMTs could not

---

[5]     The timeline is not precise. Officer Cake stated that he called DA Foster at approximately 4:00 or 4:30 a.m., *id.* at 15:13-20, 26:09-14, but Ranger Dominy did not determine that the investigation would be federal until approximately 4:45 a.m. *Id.* at 112:13-113:01. This discrepancy is immaterial to the Court's resolution of the merits of the motion to suppress.

determine whether he had internal injuries without taking him to the hospital. *Id.* at 92:06-93:11. Taking Mr. Manubolu to BHPD for a breath test would have meant diverting him from the hospital, which Officer Hardy did not want to do—in part because of the advice of the EMTs. *Id.* Officer Hardy and those at the scene were not able to take Mr. Manubolu to the hospital earlier because the EMTs had to evaluate him first and Officer Hardy had to speak briefly with Ranger Dominy. *Id.* at 94:14-95:02. Before he left for the hospital at approximately 3:53 a.m., Officer Hardy told Officer Cake something to the effect that he was going to the hospital to get a blood draw at the request of Acadia. *Id.* at 27:15-22, 96:12-18.

### 3.   The Blood Draw

Officer Hardy arrived at the hospital—which is between five and ten miles from the crash site—at approximately 4:00 a.m. *Id.* at 73:01-05. When he arrived, there were multiple people waiting for Mr. Manubolu in the emergency room with gurneys. *Id.* at 97:06-12. Officer Hardy did not initially enter the hospital room with Mr. Manubolu but did go into the room to oversee a blood draw. *Id.* at 73:11-23.

Officer Hardy ordered a blood draw on the basis of 29-A M.R.S. § 2522, which he believed dictates that when a driver is involved in a crash resulting in serious injury or death, the driver is obligated to submit his or her blood to a law enforcement officer. *Id.* at 73:24-74:06. He also testified that at this point, he had probable cause to believe that Mr. Manubolu had operated his vehicle under the influence of alcohol. *Id.* at 74:06-08. Officer Hardy stated that he applied section 2522 because the crash occurred in Bar Harbor and that that is what BHPD does when there is a fatal crash

in Bar Harbor. *Id.* at 74:09-18. He further stated that at the time the blood was drawn, it was not clear to him whether the case would be a federal or state prosecution. *Id.* at 74:19-24.

Officer Hardy brought a BHPD blood kit to the hospital and asked a nurse if she would be willing to obtain a blood sample from Mr. Manubolu, and she agreed. *Id.* at 74:25-75:08. He then entered the room where Mr. Manubolu was and asked for his consent. *Id.* at 75:08-09. Mr. Manubolu was at first hesitant and then stated that he did not believe he wanted to give a blood sample; Officer Hardy indicated that Mr. Manubolu was not consenting to a blood draw. *Id.* at 75:09-13. At that point, Officer Hardy advised Mr. Manubolu of his obligation under section 2522; Mr. Manubolu said that he understood and allowed the nurse to draw his blood. *Id.* at 75:15-76:01. The blood draw took place at approximately 4:24 a.m., approximately ninety minutes after the car crash. *Id.* at 76:02-07. At some point, Acadia Ranger Darren Belskis arrived at the hospital. *Id.* at 86:17-87:05.

At another point, doctors approached Officer Hardy and told him that Mr. Manubolu had requested his presence in the CT scan room.[6] *Id.* at 97:13-18. Mr. Manubolu told Officer Hardy that he felt he did not deserve any medical testing because of what happened to his friends; Officer Hardy encouraged him to get a CT scan. *Id.* at 97:16-98:08.

---

[6]     It is unclear from Officer Hardy's testimony when this occurred, but the Court assumes it took place after Mr. Manubolu's blood was drawn, as Officer Hardy testified that between arriving at the hospital and the blood draw, he was near the nurses' station. *Id.* at 100:19-101:02.

### 4.    Contacting the United States Attorney's Office

At approximately 3:15 a.m., before Ranger Dominy arrived on scene, either he or Deputy Chief Ranger Picard made a phone call to Assistant United States Attorney (AUSA) Raphaelle Silver, but the call was unanswered. *Id.* at 110:19-111:02. The Ranger's Office has a call-out list every month from the USAO informing them who is available for after-hours incidents. *Id.* at 111:02-04. Because he was unable to reach AUSA Silver, Ranger Dominy called AUSA Joel Casey, who also did not pick up the phone. *Id.* at 111:04-06. Finally, Ranger Dominy called AUSA Andrew McCormack, who did answer the phone and agreed to try to reach out to the AUSA on call. *Id.* at 111:06-10. The call to AUSA McCormack did not occur until after Mr. Manubolu had already left the scene for the hospital. *Id.* at 119:09-12.

Between 4:00 and 4:15 a.m., Deputy Chief Ranger Picard arrived on scene. *Id.* at 112:10-12. At approximately 4:45 a.m., Ranger Dominy spoke to AUSA Silver, who informed him that the prosecution would be federal and that he should send a ranger to the hospital to meet with Officer Hardy. *Id.* at 112:13-113:01. Ranger Belskis arrived on scene at approximately 5:00 a.m. and Ranger Dominy told him to go to the hospital to meet with Officer Hardy. *Id.*

After speaking with AUSA Silver, Ranger Dominy spoke with Officer Cake. *Id.* at 113:02-05. Officer Cake told Ranger Dominy that he had called the District Attorney's Office and only gotten a voicemail. *Id.* at 113:02-07. Ranger Dominy told Officer Cake that he had spoken to AUSA Silver and that the case would be prosecuted federally. *Id.* at 113:07-10. It was after speaking with AUSA Silver at

approximately 4:45 a.m. that Ranger Dominy indicated that the officers on scene would need to attempt to secure a warrant for a blood sample.  *Id.* at 115:13-19.  He was aware prior to this point that there was a telephonic warrant process, but in Maine, he and the other Acadia rangers do not contact magistrate judges directly, instead working through the USAO.  *Id.* at 115:20-116:11.

Ranger Dominy left the scene of the accident at approximately 7:00 a.m.  *Id.* at 123:03-04.  He went to his office, wrote up a probable cause statement, and emailed it to AUSA Silver at around 8:00 or 8:30 a.m.  *Id.* at 125:16-126:03, 129:24-130:03.  A warrant was procured at approximately 10:30 a.m.  *Id.* at 130:04-09.

### 5. Concurrent Jurisdiction Between Bar Harbor Police Department and Acadia National Park

Officer Hardy's understanding is that when BHPD is first on the scene of an incident in Acadia National Park, BHPD is in charge; however, when Acadia rangers arrive, command shifts to Acadia.  *Id.* at 77:04-11.  In Officer Hardy's experience, whether an incident that takes place in Acadia is prosecuted federally or at the state level is a gray area.  *Id.* at 78:14-79:05.  Officer Cake stated that as an officer, he is not able to make the decision as to whether a case is prosecuted by the state or federally.  *Id.* at 37:14-19.  Acadia has never handled a triple fatality in Ranger Dominy's experience.  *Id.* at 108:23-109:02.  Because of the concurrent jurisdiction between Acadia and BHPD, Acadia often notifies Maine State Police when it has a case involving a fatality and offers to have them assist in the investigation.  *Id.* at 109:03-08.

12

Ranger Dominy understands that when there is a conflict of laws, federal law has supremacy, but he stated that since 1986, state officers have had full authority to enforce state laws within Acadia. *Id.* at 111:22-112:03. According to Ranger Dominy, Acadia has turned operating under the influence (OUI) cases over to BHPD, Mount Desert Police Department, and Southwest Harbor Police Department on a routine basis when those OUIs occur within a state right-of-way and in other select circumstances. *Id.* at 113:11-114:07. Ranger Dominy was aware on August 31, 2019, of National Park Service regulations stating that, absent exigent circumstances, a driver cannot ordinarily be required to submit blood samples for the purpose of determining blood alcohol content without a search warrant. *Id.* at 117:11-20.

### 6. Bar Harbor Police Department's Process for Getting a Breathalyzer Test

To give Mr. Manubolu a breath test, one of the responding officers would have had to take him to the BHPD where the officer would have checked Mr. Manubolu's mouth for blood. *Id.* at 38:02-17. The officer would have then had to wait fifteen minutes after checking his mouth and the intoxilyzer device would take approximately twenty-two to twenty-three minutes from when the officer finished entering data before it was ready. *Id.* at 38:18-25. The entire process, from travel time from the accident scene to finishing the test, would have taken approximately forty to fifty minutes, but could have taken as little as thirty. *Id.* at 39:01-05, 45:08-16.

### 7. Bar Harbor Police Department's Process for Getting Search Warrants

In his time with BHPD, Officer Cake said that he has previously charged OUI cases that occurred in Acadia and that these cases have been prosecuted by the district attorney's office in Ellsworth, Maine.[7]  *Id.* at 16:24-17:13.  Officer Hardy said that the first step in getting a search warrant is to remove an officer from the scene to return to BHPD headquarters where he or she can use a computer to draft a search warrant.  *Id.* at 79:09-19.  Officer Cake says that typing up a warrant takes between twenty and sixty minutes.  *Id.* at 18:02-04.  The next step is for a supervisor to look it over and approve it, and then it is sent to the District Attorney's Office for further approval.  *Id.* at 18:05-06.  On a weekday when there is a judge in Ellsworth, Maine, the officer seeking the warrant must drive a physical copy of the warrant to the judge.  *Id.* at 18:06-11.  When it is late in the evening on a weekend, that officer would instead have to find the closest justice of the peace, as warrants must be sworn in person.  *Id.* at 18:11-13, 80:10-14.  In this case, that justice of the peace lives in Blue Hill, a forty-five- or fifty-minute drive from the accident site.  *Id.* at 18:14-18.  BHPD does not have the capability for electronic or telephonic warrants, and as a matter of practice, officers do not type up warrant affidavits in their cruisers.  *Id.* at 18:19-19:01.  Even if an officer did type an affidavit in a cruiser, the officer  would still need to return to the BHPD office to print it.  *Id.* at 19:02-06.

---

[7]        Counsel for Mr. Manubolu objected to the Government's questions about past cases on relevance grounds.  *Id.* at 17:02-07.  The Court overrules this objection.  BHPD's past practice regarding cases arising in Acadia is relevant to what Officer Hardy believed about a potential prosecution of Mr. Manubolu when he ordered the blood draw.

Officer Hardy stated that he would not submit a warrant to the justice of the peace if it had not been approved by an assistant district attorney or his supervisor and stated that he does not know what would happen if he tried to do so. *Id.* at 80:15-81:16. Officer Hardy acknowledged that this is a matter of BHPD best practice, not state law or department policy. *Id.* at 88:20-90:12. Officer Hardy said that in a similar late-night car crash with probable cause to believe the driver had been drinking, the process for obtaining a warrant took five hours. *Id.* at 81:17-82:04. Officer Hardy stated that in that case, he and fellow officers opted to get a search warrant for a blood draw despite section 2522 because of "recent case law . . .." *Id.* at 82:01-02.

Officer Hardy is not aware of procedures under Maine law allowing him to get a search warrant without being in the physical presence of a justice of the peace. *Id.* at 87:14-88:07. Officer Cake estimated that it would have taken approximately three to five hours to get a warrant from the justice of the peace in Blue Hill. *Id.* at 49:08-16.

### 8.    Acadia National Park's Process for Getting Search Warrants

Ranger Dominy has never drafted a search warrant in Maine, though he has done so in other parks. *Id.* at 114:08-10. He does not have a laptop in his work truck. *Id.* at 114:11-12. To get a search warrant for a blood draw, Ranger Dominy would have had to provide an affidavit or statement of probable cause to the USAO, and then someone at the USAO would draft a warrant. *Id.* at 114:13-20. To draft an affidavit, Ranger Dominy would have had to return to his office, which is six miles

from the accident scene.  *Id.* at 115:04-07.  He would then review the warrant to make sure that his statements were correct before it was transmitted to the magistrate judge.  *Id.* at 114:20-22.  Ranger Dominy does not have contact information for federal magistrate judges in the District of Maine.  *Id.* at 121:07-11.  He has appeared before magistrate judges for arrest warrants in Maine, but on the morning of August 31, 2019, he was attempting to get a telephonic warrant.  *Id.* at 114:23-115:03.

## II.    POSITIONS OF THE PARTIES

### A.    Praneeth Manubolu's Motion

Mr. Manubolu states that his "constitutional right to be free from unreasonable searches and seizures . . . was plainly violated when an unauthorized person obtained a blood sample from [him] without his consent and absent exigent circumstances." *Def.'s Mot.* at 2.

### 1.    Federal Law Is Controlling in This Case

Mr. Manubolu points out that the car accident "occurred in Acadia National Park, which is 'federally owned lands . . . administered by the National Park System' and subject to federal regulations contained in Title 36, chapter 1."  *Id.* (quoting 36 C.F.R. § 1.2) (citing *United States v. Farmer*, 820 F. Supp. 259, 262 (W.D. Va. 1993)). He contends that "[u]nder [National Park Service (NPS)] regulations, state law only governs 'traffic and the use of vehicles within a park area' . . . *if it is not 'specifically addressed by regulations in* [*Title 36, chapter I of the NPS regulations*]."  *Id.* at 3 (emphasis in *Def.'s Mot.* (quoting 36 C.F.R. § 4.2(a)).  Mr. Manubolu asserts that the NPS regulation, which requires a search warrant for a blood draw absent exigent

circumstances, controls.  *Id.* (citing *Farmer*, 820 F. Supp. at 262-63 (discussing 36 C.F.R. § 4.23(a))).  Because the federal regulation controls, in Mr. Manubolu's view, Officer Hardy was "obligated to apply" it.  *Id.*

### 2. Praneeth Manubolu's Blood Was Drawn in the Absence of a Warrant and Exigent Circumstances

Mr. Manubolu states that under 36 C.F.R. § 4.23(c)(1), when there is probable cause to believe that a vehicle "operator has violated the regulation's prohibition of driving while under the influence of intoxicants, the operator is required to submit to a 'test of the breath, saliva, or urine" but is not required to submit to a blood test.  *Id.* at 4 (quoting 36 C.F.R. § 4.23(c)(1)).  According to Mr. Manubolu, this was not always the case: the NPS regulations were recently updated to comply with the Supreme Court's decisions in *Missouri v. McNeely*, 569 U.S. 141 (2013), and *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016).  *Def.'s Mot.* at 4-5.  Mr. Manubolu turns to the decision in *United States v. Hutchinson*, No. 2:16-CR-168-DBH, 2018 WL 447619 (D. Me. Jan. 17, 2018), and argues that *Hutchinson* underscores the Supreme Court's holding in *McNeely* that "the natural dissipation of alcohol in the bloodstream does not create per se exigent circumstances."  *Def.'s Mot.* at 5-6.  Lastly, Mr. Manubolu argues that Officer Hardy "was not an 'authorized person' to even request or direct a blood draw in this case" within the meaning of 36 C.F.R. § 4.23(c)(1).  *Id.* at 6-7 (citing 36 C.F.R. § 1.4(a)).

**B.    The Government's Response**

**1.    Officer Hardy Acted Within His Authority When He Drew Praneeth Manubolu's Blood**

The Government asserts that "[t]he State of Maine and the Federal Government have concurrent jurisdiction over crimes and offenses committed within Acadia National Park," *Gov't's Resp.* at 3 (citing 1 M.R.S. § 8; 40 U.S.C. § 3112), and "[*b*]*oth* state and federal officials are permitted to enforce their respective laws, with the qualifier that the State's authority to enforce laws is limited by the Supremacy Clause of the United States Constitution." *Id.* (emphasis in *Gov't's Resp.*).  It claims that "[t]he sample of [Mr. Manubolu's] blood was lawfully obtained under Title 29-A M.R.S. § 2522, section 1," and that "at 4:24 a.m., when no decision had been made as to whether the United States or the State of Maine would prosecute the case, under Maine law, Officer Hardy lawfully obtained the blood sample taken from the [Mr. Manubolu]." *Id.* at 3-4.  The Government notes that 29-A M.R.S. § 2522 was, at the time it filed its response, subject to a constitutional challenge at the Maine Supreme Judicial Court sitting as the Law Court and that "[s]hould the Law Court deem the statute unconstitutional, the Government submits the blood test is still admissible under the good faith exception." *Id.* at 4 n.2 (citing cases, including *United States v. Leon*, 468 U.S. 897 (1984)).

The Government also argues that "there is no bar to officers of one jurisdiction accepting and using evidence legally seized by officers of another jurisdiction for prosecution of a crime" and contends that "[t]he proper standard in determining the admissibility of evidence seized by state officials in violation of a federal statute is

whether state officials complied with state law and the Fourth Amendment, or had objectively reasonable basis to believe they were complying with state law and the Fourth Amendment." *Id.* at 4-5 (citing *United States v. Moore*, 956 F.2d 843 (8th Cir. 1992)).

### 2.   Exigent Circumstances Existed

The Government posits that even if section 2522 is not applicable, "exigent circumstances existed allowing Officer Hardy to obtain the blood sample without prior authorization from the court" because this case involves the investigation of "a serious crash in which three people were killed, and [Mr. Manubolu] was injured," leading the officers to focus "on assessing the scene, the injuries of those involved, and performing life-saving measures on one of the passengers." *Id.* at 5-6. Furthermore, the Government states, Mr. Manubolu "was brought to the hospital approximately two hours after the crash, and nearly four and a half hours after he last admitted drinking alcohol." *Id.* at 6.  In the Government's view, "[i]n the time it would have taken law enforcement officers to draft a warrant, have it reviewed by a prosecutor, and finally by a judge, the evidence of the defendant's impairment would have been destroyed." *Id.*  This was not, according to the Government, "a routine operating under the influence investigation, and exigent circumstances existed justifying a blood draw to be taken from [Mr. Manubolu] without a warrant." *Id.* at 7.  The Government distinguishes *Hutchinson*, suggesting that unlike in that case, here, "the blood draw occurred approximately two hours after the accident," "[m]ultiple officers smelled alcohol coming from [Mr. Manubolu], and [Mr. Manubolu]

admitted to drinking prior to driving," and "there existed explicit statutory authority for the warrantless blood draw as well as exigent circumstances." *Id.* at 7-8.

### C.   Praneeth Manubolu's Reply

Mr. Manubolu reiterates his contentions that federal law, not state law, controls and that there were no exigent circumstances in this case to allow a blood draw without a warrant or his consent. *Def.'s Reply* at 1.  He then addresses the arguments made by the Government.

#### 1.   Concurrent Jurisdiction Is Irrelevant to the Choice of Law Issue Present Here

Mr. Manubolu points out that the Government "fails to even address in its response" the choice of law issue which he says is "[t]he actual issue . . .." *Id.* at 2. Mr. Manubolu states that under the Assimilative Crimes Act (ACA), 18 U.S.C. § 13, "state law applies in federal enclaves, such as National Parks, only when there is a gap in federal law." *Id.* at 2-3 (citing *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1891 (2019)).   Mr. Manubolu argues that 36 C.F.R. § 4.23(c) specifically addresses the same area of law as 29-A M.R.S. § 2522—the requirements for obtaining a blood sample in an OUI investigation—and therefore supersedes the state law. *Id.* at 4-5.  Mr. Manubolu also argues that 36 C.F.R. § 4.23(c) precludes application of 29-A M.R.S. § 2522 because applying section 2522 would interfere with the achievement of federal policy and practice, which is to only require blood draws absent a warrant when there are exigent circumstances. *Id.* at 5-6 (citing *Lewis v. United States*, 523 U.S. 155, 164 (1998)).

Furthermore, Mr. Manubolu contends, the Government is wrong to assert that section 2522 is applicable because of concurrent jurisdiction as under the ACA, "it simply has no force in Acadia National Park." *Id.* at 6. Mr. Manubolu characterizes the Government's argument as "pick[ing] and choos[ing] which law it gets to apply— state or federal" when a crime is committed in Acadia. *Id.* at 7. Mr. Manubolu asserts that this is "inconsistent with case law, federal regulations under Title 36, and" Article Three, Section 2, Clause Three of the United States Constitution. *Id.* He also views it as "an expansive and dangerous interpretation of [the Government's] authority." *Id.*

Mr. Manubolu considers the Government's position even more concerning "when considered in light of the consensus of understanding on-scene between NPS and the [BHPD] that this was an NPS case." *Id.* at 8. Mr. Manubolu then focuses on the Government's assertion "that 'there is no bar to officers of one jurisdiction accepting and using evidence legally seized by officers of another jurisdiction for prosecution of a crime,'" *id.* at 8-9 (emphasis omitted) (quoting *Gov't's Resp.* at 4), arguing that this argument is unavailing because the initial blood draw was not legally seized. *Id.* at 9. Lastly, Mr. Manubolu argues that "even if this Court was to adopt the Government's position and apply 29-A M.R.S. § 2522 . . . the results of the test should still be suppressed because the Maine statute is unconstitutional." *Id.* at 9-10.

### 2. The Government Has Not Met Its Burden to Show Exigent Circumstances

Mr. Manubolu argues that "[i]n this case, law enforcement did not reasonably believe that there was a compelling necessity for immediate action in lieu of obtaining a warrant; they were acting under the guise of the inapplicable Maine statute when they demanded [Mr.] Manubolu to submit to a blood draw." *Id.* at 11. Mr. Manubolu refers to this as a "[p]ost hoc reconstruction [of exigent circumstances to justify law enforcement's failure to seek a warrant] . . .." *Id.* (alterations in original) (paraphrasing *Hutchinson*, 2018 WL 447619, at *8). Mr. Manubolu also points out that "[l]aw enforcement was not faced with any emergency" once EMTs and the fire department became involved in addressing the medical needs of Mr. Manubolu and his passengers but was rather "standing by with no compelling necessity for immediate action." *Id.* at 11-12. Mr. Manubolu argues that the Government's position that getting a search warrant would have taken too long is "dismissive of the Supreme Court's holding in *McNeely*" and further contends that "this position is also indifferent to the advances in technology that have significantly reduced the amount of time and effort that is required in order to obtain a warrant . . .." *Id.* at 12.

Lastly, Mr. Manubolu argues that the Government's "perfunctory" argument that the good-faith exception applies is incorrect because "[a] State of Maine law enforcement officer never should have sought to apply a flawed Maine statutory provision to [Mr.] Manubolu in this accident that took place on federal land and which requires application of federal regulations when it comes to blood tests . . .." *Id.* at

22

13.  He asserts that this position is further undercut by the BHPD officers' frequent suggestions at the scene that they viewed the case as one being handled by NPS.  *Id.*

## III.   DISCUSSION

### A.  The Federal Prosecution

To return to basics, this Court "begin[s] with the proposition that federal law governs federal prosecutions in federal court." *United States v. Sutherland*, 929 F.2d 765, 769 (1st Cir. 1991).   Pending before this Court is a federal indictment, charging three counts of manslaughter, alleged violations of federal statutory law, 18 U.S.C. § 1112(a); two operating under the influence counts, alleged violations of federal regulation, 36 C.F.R. § 4.23(a)(1) and (2); and one unsafe operation of a motor vehicle count, an alleged violation of 36 C.F.R. § 4.22(b)(1).   *Indictment* at 1-4.   To be admissible in a federal criminal proceeding, the proffered evidence must comport with the Federal Rules of Evidence, federal constitutional law, and federal law and regulation.   FED. R. EVID. 1101(a); *McInnis v. A.M.F., Inc.*, 765 F.2d 240, 245 (1st Cir. 1985) (Federal Rules of Evidence apply in federal criminal proceedings); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring in part); *Rodriguez de Quijas* v. *Shearson/Am. Express, Inc.*, 490 U. S. 477, 484 (1989).   A lower federal court is duty-bound to apply the constitutional teachings of the United States Supreme Court to the cases before it.   As Justice Kavanaugh recently wrote in concurrence:

> [V]ertical *stare decisis* is absolute, as it must be in a hierarchical system with "one supreme Court."  U. S. CONST., Art III, §1.  In other words, the state courts and the other federal courts have a constitutional obligation

to follow a precedent of this Court unless and until it is overruled by this Court.

*Ramos*, 140 S. Ct at 1416 n.84 (Kavanaugh, J., concurring in part).

Applying this fundamental principle to the proffered evidence of the compelled, warrantless blood test results, the Court concludes that pursuant to clear United States Supreme Court precedent, the results of the blood test are inadmissible at a trial in federal court on federal criminal charges unless certain exceptions apply.  The notion that a blood test generally requires a warrant is nothing new:  It has been part of Supreme Court jurisprudence since 1966, when the Supreme Court decided *Schmerber v. California*, 384 U.S. 757 (1966).  *See id.* at 769-70 (stating that "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained" and holding that "[s]earch warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned"); *see also Rodriques v. Furtado*, 950 F.2d 805, 810 (1st Cir. 1991) ("The integrity of an individual's person is a cherished value of our society" (quoting *Schmerber*, 384 U.S. at 772)).  Thus, as Judge Hornby of this District concluded in 2018 when he granted in part a motion to suppress the blood test results in a situation involving a warrantless blood test for drugs, "[i]t has been clear since at least 1966 that compulsory blood draws are 'intrusions into the human body' subject to the Fourth Amendment's prohibition on unreasonable searches and seizures."  *United States v. Hutchinson*, No. 2:16-CR-168-DBH, 2018 WL 447619, at *3 (D. Me. Jan. 17,

2018).  As Judge Hornby noted, in 2013 and 2016, the United States Supreme Court reaffirmed and strengthened *Schmerber* in *McNeely* and *Birchfield*.

In *McNeely*, the Supreme Court answered whether  "the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations."  *McNeely*, 569 U.S. at 147 (emphasis in original).  The Supreme Court made clear that the dissipation of alcohol does not create a per se exigency allowing a warrantless blood draw: "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."  *Id.* at 152.  The Supreme Court also noted that "because a police officer must typically transport a drunk-driving suspect to a medical facility . . . before conducting a blood test, some delay between the time of the arrest or accident and the time of the test is inevitable regardless of whether police officers are required to obtain a warrant."  *Id.* at 153.

In *Birchfield*, decided just three years after *McNeely* and three years before the blood draw in this case, the Supreme Court held that blood tests may not "be administered as a search incident to a lawful arrest for drunk driving."  136 S. Ct. at 2185.  In addition, the Supreme Court stated that its "prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply" but contrasted such laws with the situation where a state "not only . . . insist[s] upon an intrusive blood

test, but also . . . impose[s] criminal penalties on the refusal to submit to such a test." *Id.* The Supreme Court held that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Id.* at 2186.

Consistent with *Schmerber*, *McNeely* and *Birchfield*, on June 8, 2018, well before the accident in this case, the NPS amended 36 C.F.R. § 4.23(c) to clarify that the operator of a motor vehicle may not be required to submit to a blood test absent exigent circumstances. Technical and Clarifying Edits; Criminal Violations NPS Units Nationwide, 83 Fed. Reg. 26594 (June 8, 2018) (to be codified at 36 C.F.R. pt. 1, 4). Indeed, the NPS noted that "[i]n practice, NPS law enforcement officers generally stopped requiring blood tests after the *McNeely* decision in 2013." *Id.*

It does not matter that the blood draw was conducted by a BHPD officer rather than a park ranger. The NPS regulations expressly provide that state law governs in the national parks "[u]nless specifically addressed by regulations in this chapter." 36 C.F.R. § 4.2(a). As the search warrant requirement for a blood test is "specifically addressed" by 36 C.F.R. § 4.23(c), the regulation, not the state statute, controls. As noted earlier, a federal trial court is bound to apply the law as interpreted by the United States Supreme Court; all the more so in a criminal case proceeding in federal court under a federal criminal statute. Based on clear Supreme Court precedent and an equally clear federal regulation, if a Ranger, not a local police officer, had ordered this blood test, the Ranger would have violated binding precedent and applicable regulation and the results would be inadmissible in a federal court unless an exception to the warrant requirement applied.

If this were a state proceeding, it would be governed by state law subject to the rulings of the Maine Supreme Judicial Court and to the ultimate authority of the United States Supreme Court.  But this is a federal, not state proceeding and the admissibility of evidence in a federal criminal proceeding must be governed by federal, not state law.  The enforceability of the United States Supreme Court's rulings on constitutionality cannot depend on whether the unconstitutional act was ordered by a federal or a state law enforcement officer.  *See Elkins v. United States,* 364 U.S. 206, 223 (1960) ("we hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial").  As the mandated blood test violated both United States Supreme Court precedent and federal regulation, even though a state officer ordered the tests, the results of the test must be suppressed unless an exception applies.

Citing the non-binding case *United States v. Moore*, 956 F.2d 843 (8th Cir. 1992), the Government argues that "[t]he proper standard in determining the admissibility of evidence seized by state officials in violation of a federal statute is whether state officials complied with state law and the Fourth Amendment, or had objectively reasonable basis to believe they were complying with state law and the Fourth Amendment."  *Gov't's Resp.* at 4-5.  The Court will discuss the second half of this statement when it considers the good faith exception to the warrant requirement.

But as to the first half, when analyzed properly, *Moore* strongly supports exclusion of the blood draw evidence in this case.

In *Moore*, an Omaha, Nebraska police officer applied for and was granted a "no-knock" search of a residence where it was suspected the resident was dealing drugs. *Id.* at 845. State law enforcement executed the "no-knock" warrant and found "several sets of controlled substances packaged for sale, a handgun, and drug paraphernalia." *Id.* The state of Nebraska initiated criminal charges against the resident but, after the federal prosecution was commenced, the state dismissed its charges. *Id.* Citing a federal statute that prohibits "no-knock" warrants, 18 U.S.C. § 3109[8], the defendant moved to suppress the results of the search for purposes of the federal trial. *Id.* The district court suppressed the evidence, reasoning that the state law enforcement officer had to be treated as a federal officer for purposes of the admission of evidence in federal court, that the federal statute prohibited the "no-knock" warrant, and that the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984), did not apply. *Id.* at 845-46.

The Eighth Circuit rejected the district court's refusal to apply the good faith exception under *Leon*. The *Moore* Court wrote:

> [W]e come to the narrow question at issue here—when state officers, acting totally without federal involvement, seize evidence that is later offered in a federal prosecution, must that evidence be excluded if the no-knock entry violated § 3109, a federal statute that is more restrictive

---

[8]      18 U.S.C. § 3109 reads:

The officer may break open any outer or inner door, or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

than the Fourth Amendment? We agree with the majority of federal courts that have declined to apply § 3109 in this situation.

*Id.* at 847.  The Eighth Circuit stressed that "[h]ere, § 3109 was irrelevant to [the state police officer and the County judge] at the time the warrant issued; they were acting under a state search warrant statute to investigate possible violations of state law." *Id.*

Setting aside whether the Bar Harbor police officer in this case acted "without federal involvement," a questionable premise, the Eighth Circuit in *Moore* repeatedly emphasized that it was not dealing with a search that violated the Fourth Amendment:

> It is true that, if state officers seize evidence in violation of the Fourth Amendment and turn that evidence over to federal officers (a practice known, when lawful, as the "silver platter"), the evidence must be excluded in a resulting federal prosecution.

*Id.* at 846 (citing *Elkins v. United States*, 364 U.S. 206 (1960)).[9]  The Eight Circuit wrote that the United States Supreme Court "reaffirmed this principle, in the rather

---

[9]      The Supreme Court recently discussed the "silver platter doctrine" in *Gamble v. United States*, 139 S. Ct. 1960 (2019).

> [W]hat if state or local police conducted a search that would have violated the Fourth Amendment if conducted by federal agents? Before incorporation, the state search would not have violated the Federal Constitution, so federal law would not have barred admission of the resulting evidence in a state prosecution. But by the very same token, under what was termed "the silver-platter doctrine," state authorities could hand such evidence over to *federal* prosecutors for use in a federal case.

*Id.* at 1979 (emphasis in original).

> Once the Fourth Amendment was held to apply to the States as well as the Federal Government, the silver-platter doctrine was scuttled. See *Elkins* v. *United States*, 364 U. S. 206 (1960); *Wolf* v. *Colorado*, 338 U. S. 25, 69 (1949). Now the fruits of unreasonable state searches are inadmissible in federal and state courts alike.

*Id.*

> The silver-platter doctrine was based on the fact that the state searches to which it applied did not at that time violate federal law. Once the Fourth Amendment was incorporated against the States, the status of those state searches changed. Now they did violate federal law, so the basis for the silver-platter doctrine was gone.

*Id.*

sweeping language quoted by the district court, in *Preston v. United States*, 376 U.S. 364, 366 (1964)":

> The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers.

*Id.* at 846. Thus, under *Elkins*, in a federal court, a state officer's violation of the Fourth Amendment is treated as if carried out by a federal officer and, as such, the evidence from the Fourth Amendment violation is not admissible. *Moore* is limited to situations where a state law enforcement officer acts in a state investigation in accordance with existing state law that conflicts with a federal statute, and *Moore* expressly concedes that if there is a Fourth Amendment violation, federal law must prevail in federal court.

Put differently, an NPS Ranger could not elect to ignore controlling United States Supreme Court precedent and point to state law as allowing the failure to adhere to Supreme Court directive and, under *Elkins* and *Preston*, a state law enforcement officer must be treated as a federal officer for purposes of determining whether evidence is admissible in federal court. If a federal officer could not direct an unconstitutional search, a state officer cannot do so either and have the results of the tainted search admitted as evidence in a federal criminal case in federal court. The Court rejects the Government's attempt to justify an unconstitutional search and seizure in this case.

### B.     The Constitutionality of 29-A M.R.S. § 2522

Assuming the Court is incorrect and the blood draw would be admissible in federal court if the state officer seized it properly under state law, the blood draw is still inadmissible absent an exception to the Fourth Amendment because the statute on which the BHPD officer relied here, 29-A M.R.S. § 2522, is unconstitutional.  The relevant portions of section 2522 read as follows:

> **1. Mandatory submission to test.**  If there is probable cause to believe that death has occurred or will occur as a result of an accident, an operator of a motor vehicle involved in the motor vehicle accident shall submit to a chemical test, as defined in section 2401, subsection 3, to determine an alcohol level or the presence of a drug or drug metabolite in the same manner as for OUI.

> **2. Administration of test.**  The investigating law enforcement officer shall cause a blood test to be administered to the operator of the motor vehicle as soon as practicable following the accident and may also cause a breath test or another chemical test to be administered if the officer determines appropriate.  The operator shall submit to and complete all tests administered.  Except as otherwise provided in this section, testing must be conducted in accordance with section 2521.

> **3. Admissibility of test results.**  The result of a test is admissible at trial if the court, after reviewing all the evidence, whether gathered prior to, during or after the test, is satisfied that probable cause exists, independent of the test result, to believe that the operator was under the influence of intoxicants at the time of the accident.

29-A M.R.S. § 2522.  As the Government notes, *Gov't's Resp.* at 4 n.2, this statute and its predecessor, 29 M.R.S. § 1312, have faced numerous constitutional challenges.  *See State v. Cormier*, 2007 ME 112, ¶ 13, 928 A.2d 753; *id.*, ¶ 42 n.8 (Levy, J., dissenting); *State v. Roche*, 681 A.2d 472, 474-75 (Me. 1996); *State v. Bento*, 600 A.2d 1094, 1096 (Me. 1991).

In evaluating section 2522 before *Birchfield* and *McNeely*, in 2007, the Law Court in *Cormier* upheld the statute, holding that "a combination of the exigent circumstances present at the scene of a fatal accident and the inevitable discovery doctrine rendered a warrantless blood draw reasonable in the narrow circumstances contemplated by section 2522." *Maine v. Weddle*, 2020 ME 12, ¶ 23, 224 A.3d 1035 (footnote omitted) (citing *Cormier*, 2007 ME 112, ¶¶ 20-27). As an alternative holding, the Law Court "also held that '[t]he State's special needs, separate from the general purpose of law enforcement, justify an exception to the warrant requirement in these circumstances.'" *Id.* (alteration in original) (citing *Cormier*, 2007 ME 112, ¶ 36). In *Weddle*, decided in 2020 after *Birchfield* and *McNeely*, the Law Court overturned *Cormier* and held that section 2522 violated the Fourth Amendment to the United States Constitution because it allowed an individual's blood to be taken "without a warrant, without . . . consent, and without probable cause to believe that [the individual] was impaired by alcohol at the time his blood was drawn." *Id.* ¶ 30. Although not technically binding on this Court, the Court agrees with *Weddle*'s conclusion that section 2522 is unconstitutional.[10]

As noted above, *Birchfield* distinguished between "implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply" and those that "impose criminal penalties on the refusal to submit to such a

---

[10]    As a Law Court decision interpreting a state statute purely as a matter of federal constitutional law, *Weddle* is not binding authority on this Court. *See Breisch v. Cent. R.R. of N.J.*, 312 U.S. 484, 489 (1941) ("interpretation of state statutes by state courts under compulsion of federal law erroneously understood does not bind federal courts"). However, the Court "must approach cautiously any contention that the state court's constitutional interpretation is erroneous . . . for a disagreement with the state court means that two sets of rights exist" depending on the forum in which an individual is tried. *Horwitt v. Horwitt*, 90 F. Supp. 528, 529 (D. Conn. 1950).

test." *Birchfield*, 136 S. Ct. at 2185. The former category is permissible; the latter is not. "There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads." *Id.*

The statute here goes beyond imposing criminal penalties for refusal to submit to a blood test and imposes a mandate: the text of section 2522(1) states "[i]f there is probable cause to believe that death has occurred or will occur as a result of an accident, an operator of a motor vehicle involved in the motor vehicle accident *shall submit* to a chemical test," including a blood test. 29-A M.R.S. § 2522(1) (emphasis added). Subsection 1 is entitled "[m]andatory submission to test." *Id.* (emphasis omitted). Subsection 2 states that "[t]he investigating law enforcement officer *shall* cause a blood test to be administered to the operator of the motor vehicle as soon as practicable following the accident" and that "the operator *shall* submit to and complete all tests administered." *Id.* § 2522(2) (emphasis supplied). The statute, in other words, compels a blood test, something the state cannot do without meeting an exception to the Fourth Amendment's bar on unreasonable searches. *See Birchfield*, 136 S. Ct. at 2186 ("The North Dakota Supreme Court held that [the petitioner's] consent was voluntary on the erroneous assumption that the State could permissibly compel both blood and breath tests"). Section 2522 violates the Fourth Amendment by permitting a law enforcement officer to conduct a warrantless blood draw in the absence of exigent circumstances and without the consent of the subject, and it is therefore unconstitutional.

### C.    The Good Faith Exception

The United States takes the counterintuitive position that the good faith exception applies to this situation. The Government argues:

> The proper standard in determining the admissibility of evidence seized by state officials in violation of a federal statute is whether state officials complied with state law and the Fourth Amendment, or had [an] objectively reasonable basis to believe that they were complying with state law and the Fourth Amendment. The blood draw was lawfully obtained pursuant the Maine state law, and, therefore, should not be suppressed.

*Gov't's Opp'n* at 4-5. First, as the Court has just discussed, the blood test in this case simply does not meet the constitutional requirements of the Fourth Amendment and therefore, it would be inadmissible under the first part of the Government's formulation. *Id.* ("complying with state law <u>and</u> the Fourth Amendment") (emphasis supplied).

The next question, under the Government's own formulation, is whether the state law enforcement officer had a "reasonable basis" to conclude that he was complying with the Fourth Amendment. The Court's answer is that the Bar Harbor law enforcement officer had no reasonable basis to conclude that his directive to Mr. Manubolu to submit to a warrantless blood draw complied with existing Supreme Court authority and federal regulation, and it is existing Supreme Court authority and federal regulation that controls in this federal criminal case.

The Government's fallback position is that the law enforcement officer had a reasonable belief that he was authorized by state of Maine statute to compel Mr. Manubolu to submit to the blood draw, and as the Maine Supreme Judicial Court had not yet ruled section 2252 unconstitutional, the state law enforcement officer was

justified in relying on the then-current state of Maine law.  *See Weddle*, 2020 ME 12, ¶ 23.  In effect the federal prosecutor is arguing that state law trumps United States Supreme Court constitutional precedent and federal regulation, an unusual position for a federal prosecutor.  In support, as mentioned above, the Assistant United States Attorney cites *Moore*, 956 F.2d 843.  But in *Moore*, the Eighth Circuit applied the good faith exception because, when the officer applied for his no-knock warrant, "[t]here were no Supreme Court or Eighth Circuit precedents that should have warned [the officer] that his affidavit was obviously inadequate under the Fourth Amendment."  *Id.* at 851.  Here, by contrast, *Birchfield* and *McNeely* both should have made clear that a warrant was required.  However the state officer's decision would have fared in state court, the standard in federal court must be a federal standard and, under federal law, the mandated blood draw violated federal constitutional and regulatory law.

Even if this were not the case, and Officer Hardy was indeed relying on state law in the course of an investigation he thought might be prosecuted by the State, as the Government maintains, *see Gov't's Resp.* at 4-5, such reliance would still be insufficient to bring the blood draw here within the good faith exception.  "The purpose of the exclusionary rule 'is to deter future Fourth Amendment violations.'"  *United States v. Sparks*, 711 F.3d 58, 63 (1st Cir. 2013) (quoting *Davis v. United States*, 564 U.S. 229, 236-37 (2011)).  It is a "'prudential' doctrine," *Davis*, 564 U.S. at 236 (quoting *Pa. Bd. of Prob. and Parole v. Scott*, 524 U.S. 357, 363 (1998)), not "a personal constitutional right," *id.* (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)),

and "[w]here suppression [would] fail[] to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" *Id.* at 237 (some alterations in original) (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)). Because of this, "[w]hen the police comply with authoritative precedent, only to see the law evolve after the fact, there is nothing to deter . . .." *Sparks*, 711 F.3d at 63 (citing *Davis*, 564 U.S. at 238-41, 249-50)). Similarly, the good-faith exception applies when an officer acts in "reliance on a subsequently invalidated statute . . .." *Id.* at 64 n.3 (citing *Illinois v. Krull*, 480 U.S. 340 (1987)).

The Court concludes that any reliance by Officer Hardy or Ranger Dominy on *Cormier* or section 2522 in drawing Mr. Manubolu's blood was objectively unreasonable and that the purposes of the exclusionary rule are served by excluding the results of the ensuing blood draw. As the Court discussed above, section 2522 is facially incompatible with the *McNeely* decision. The unconstitutionality of section 2522 was underscored in *Birchfield*: it was beyond merely coercive, and instead mandated compliance with blood-testing. The Law Court acknowledged as much in *State v. LeMeunier-Fitzgerald*, 2018 ME 85, 188 A.3d 183, a case that upheld a different Maine statute creating civil and heightened criminal penalties for a motor vehicle operator suspected of being under the influence of drugs or alcohol who refuses to submit to a chemical test. *See id.*, ¶¶ 20, 31 (stating that statute at issue did not "create a statutory *mandate* to submit to testing").

Once the Supreme Court of the United States effectively overturns a state law, officers may not simply continue to rely in good faith on that state law until told

36

otherwise by the highest court of their state and expect that the evidence generated by the unconstitutional search and seizure will be admitted in federal court. "Vertical *stare decisis* is absolute." *Ramos* at 1416 n.84 (Kavanaugh, J., concurring in part). After *McNeely*, and certainly after *Birchfield*, *Cormier* was functionally overturned and reliance on it was unreasonable.[11]

The purpose of the exclusionary rule is to "deter future Fourth Amendment violations." *Sparks*, 711 F.3d at 63 (citing *Davis*, 564 U.S. at 236-37). That purpose is served here. If the Court did not apply the exclusionary rule, local law enforcement officers would conclude that they can ignore the logical consequences of Supreme Court precedent and continue to apply statutes and lower court precedent that have been functionally overruled until those statutes and precedent are explicitly overruled—however long that may be—by their state's highest court.

### D.    Exigent Circumstances

In the case of a warrantless search conducted without consent, exigent circumstances may also provide an exception to the warrant requirement. *See United*

---

[11]     In fact, prior to *Weddle*, Maine courts were already considering whether, in light of *McNeely* and *Birchfield*, *Cormier* and section 2522 were still good law. *See State v. Haslam*, No. CD-CR-2018-0431 (Me. Super. Ct. Nov. 1, 2019) (holding 29-A M.R.S. § 2522 unconstitutional as "a per se exigency in all cases involving deaths in motor vehicle accidents") (available on docket, *Def.'s Reply*, Attach. 3); *State v. Goucher*, No. CR-2017-1224, 2018 WL 6355798, at *12-13 (Me. Super. Ct. Oct. 16, 2018) (questioning the continued viability of the *Cormier* holding in light of *McNeely* and *Birchfield*); *State v. Palmer*, No. CD-CR-16-796, 2016 WL 7975563, at *3-4 (Me. Super. Ct. Nov. 15, 2016) (suppressing results of one blood draw taken pursuant to 29-A M.R.S. § 2522 in part because there was no evidence that the defendant consented or that there was a warrant; allowing results of a subsequent warrantless blood draw based not on § 2522, but on exigent circumstances exception), *aff'd*, 2018 ME 108, 190 A.3d 1009.
        The shifting landscape on the topic of warrantless blood draws does not appear to have gone unnoticed in the Maine law enforcement community. Officer Hardy testified that in a recent case involving a late-night crash and a serious injury, he and his fellow officers "opted to go with a search warrant for the blood draw" because of "recent case law . . . ." *Suppression Hr'g* at 82:01-02.

*States v. D'Andrea*, 648 F.3d 1, 11 (1st Cir. 2011). "The government bears the burden of proving exigent circumstances." *United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005) (citing *United States v. Baldacchino*, 762 F.2d 170, 176 (1st Cir. 1985)). In the case of a warrantless blood draw, as the Supreme Court recently clarified, "exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application."[12] *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2537 (2019). The Government has not put forward sufficient facts to meet its burden under this test.

The Government asserts that exigent circumstances justified the draw of Mr. Manubolu's blood because the accident took place "[i]n the very early morning hours;" because it involved "law enforcement from multiple departments;" because it required an investigation of "a serious crash in which three people were killed, and the defendant was injured," leading law enforcement officers to "focus[] on assessing the scene, the injuries of those involved, and performing life-saving measures;" because officers had to spend time "asking [Mr. Manubolu] questions to determine what could have caused the accident and who the passengers in his car were;" and because "[Mr. Manubolu] was brought to the hospital approximately two hours after the crash, and nearly four and a half hours after he last admitted drinking alcohol." *Gov't Resp.* at

---

[12]     The parties do not dispute that the alcohol in Mr. Manubolu's blood was dissipating or that there was probable cause to believe that Mr. Manubolu had been driving under the influence of alcohol. (As to this second point, if this issue were in dispute, the Court would find that there clearly was probable cause. Mr. Manubolu admitted recent consumption of alcohol and Officers Hardy and Cake both identified multiple indicia of intoxication.)  The Court focuses its inquiry on the second prong of the test laid out in *Mitchell*.

6.  The Government states that "[i]n the time it would have taken law enforcement officers to draft a warrant, have it reviewed by a prosecutor, and finally by a judge, the evidence of the defendant's impairment would have been destroyed." *Id.*

The Court finds additional facts illuminating with regard to the Government's claim of exigent circumstances.  First, though Officers Cake, Hardy, and Harrington initially were required to provide emergency services when they arrived on scene, they were relieved from that duty by the arrival of an ambulance and three EMTs only sixteen minutes after Officer Cake arrived on scene. *Suppression Hr'g* at 9:11-13, 12:24-13:13, 68:01-07, 90:20-22.

Second, by the time the ambulance did arrive, to Officer Hardy's knowledge, all three of the passengers were dead. *Id.* at 66:16-17.

Third, Mr. Manubolu's visible injuries consisted only of a goose egg-sized bump underneath his eye and some cuts and scrapes. *Id.* at 66:05-08.

Fourth, though the USAO has an on-call list, when Ranger Dominy or Deputy Chief Ranger Picard called AUSA Silver—the AUSA on call that morning—at 3:15 a.m., the call went unanswered. *Id.* at 110:19-111:02.  A call at approximately the same time to AUSA Casey also went unanswered. *Id.* at 111:04-06.  It was not until sometime after Mr. Manubolu left the scene, at approximately 3:53 a.m., *id.* at 27:15-22, that Ranger Dominy got in contact with AUSA McCormack, who agreed to reach out to AUSA Silver, *id.* at 111:06-10, 119:09-12, and it was not until approximately 4:45 a.m.—well after Mr. Manubolu's blood draw took place at 4:24 a.m., *id.* at 76:02-07—that Ranger Dominy finally spoke with AUSA Silver. *Id.* at 112:13-113:01.

Similarly, it was not until sometime between 4:00 and 4:34 a.m. that Officer Cake attempted to contact D.A. Foster, who did not answer. *Id.* at 26:09-14, 36:25-37:04.

Fifth, when Officer Hardy drew Mr. Manubolu's blood, he did so explicitly based on his supposed authority under 29-A M.R.S. § 2522. *Id.* at 73:24-74:06. Additionally, at the time that Ranger Dominy and Officer Hardy discussed Officer Hardy going to the hospital to obtain a blood sample from Mr. Manubolu, Ranger Dominy believed that Maine law (assumedly section 2522) gave Officer Hardy authority to draw Mr. Manubolu's blood without a warrant and further was aware that NPS regulations stated that absent exigent circumstances, an operator could not ordinarily be required to submit to a blood draw without a warrant. *Id.* at 117:11-20, 120:05-12.

Based on these facts, the Government's argument that exigent circumstances were present here fails for several reasons. First, it is difficult for the Government to argue that exigent circumstances excuse the lack of warrant when Officer Hardy and Ranger Dominy's explicit justification for seeking a blood draw from Mr. Manubolu was section 2522.[13]

In *Hutchinson*, government investigators erroneously believed that they had thirty-two hours in which to obtain a blood test before the evidence they sought would

---

[13]    At the suppression hearing, Ranger Dominy testified he also believed at the time that the blood draw was justified by exigent circumstances. *Id.* at 120:12-17. The Ranger explained that he thought because three people were dead, his knowledge of when the local bars close, and Mr. Manubolu's own statement as to when he last drank alcohol, there were exigent circumstances justifying the warrantless blood draw. *Id.* In the Court's view, although some of these factors could support a conclusion of exigent circumstances, they do not establish the legal standard of exigent circumstances. For example, not included in Ranger Dominy's calculation is evidence of how long it would take to get approval of a search warrant and how long it would be before the blood sample would be inconclusive based on natural dissipation.

be destroyed, that the defendant was required to consent to the test, and that no warrant was required, and they acted on these mistaken assumptions.  2018 WL 447619, at *2, *8.  Judge Hornby stated that "[p]ost hoc reconstruction will not suffice" to rescue a warrantless blood draw when the officers at the time did not act as if they faced any sort of exigency.  *Id.* at *8.  He further quoted the First Circuit in *Morse v. Cloutier*, 869 F.3d 16 (1st Cir. 2017), stating that "[t]he bottom-line question is whether a reasonable officer would have thought, given the facts known to him, that the situation he encountered presented some meaningful exigency." *Hutchinson*, 2018 WL 447619, at *8 (emphasis omitted) (quoting *Morse*, 869 F.3d at 24).  The situation is similar here—whatever post hoc reconstruction the Government can create, at the time of the blood draw, the record demonstrates that Officer Hardy and Ranger Dominy did not believe they faced any sort of exigency because they believed that Officer Hardy possessed the authority to mandate a blood draw under 29-A M.R.S. § 2522.[14]

Second, the Government focuses on the fact that the officers on the scene were required to investigate a serious crash while focusing on the injuries to Mr. Manubolu and his passengers.  *Gov't's Resp.* at 6.  The Government frames the response of these

---

[14]      The Government attempts to differentiate *Hutchinson*, arguing that "[u]nlike Hutchinson, in this case, the blood draw occurred approximately two hours after the accident.  Multiple officers smelled alcohol coming from [Mr. Manubolu], and [Mr. Manubolu] admitted to drinking prior to driving." *Gov't's Resp.* at 8.  The Court does not view this second point—that Mr. Manubolu smelled like alcohol and admitted to drinking—as bearing on whether exigent circumstances existed, as opposed to whether probable cause that he was drinking existed, and the Government does not explain why it should.  With regard to this first point—that in this case, the blood draw ultimately took place two hours after the accident—this suggests to the Court that the case for exigent circumstances was better in *Hutchinson* than here, as in *Hutchinson*, the blood draw took place approximately eleven-and-a-half hours after the accident took place.  2018 WL 447619, at *2.

41

officers as reasonable. *Id.* However, as of half an hour after Officer Cake first responded, there was a panoply of individuals on scene, including Officers Cake, Hardy, and Harrington, Ranger Dominy, and three EMTs. Additionally, according to Officer Hardy, Mr. Manubolu's passengers were dead, meaning that the only medical care required was for Mr. Manubolu. At this point, there were three EMTs for one injured individual whose visible injuries were minor; the BHPD officers and Ranger Dominy were not necessary for providing emergency care. While Officer Hardy was busy talking to Mr. Manubolu and Officer Cake was busy for at least part of that time documenting the crash scene, it is not altogether clear from the record why the BHPD officers and Ranger Dominy did not put more effort into obtaining a warrant. In fact, the Supreme Court in *McNeely* spoke directly to this scenario:

> Consider, for example, a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer. In such a circumstance, there would be no plausible justification for an exception to the warrant requirement.

*McNeely*, 569 U.S. at 153-54. Here, the Court cannot think of an explanation for why more attempts were not made to secure a warrant other than the obvious: that the officers on the scene did not believe a warrant was necessary due to section 2522.

Third, there is an extent to which the USAO created—through failure to adhere to its own internal policies—the circumstances which it now calls "exigent." The record suggests to the Court that two AUSAs who were supposed to be on call for emergencies did not pick up their phones when called. Ranger Dominy was not able to get in touch with the USAO until after Officer Hardy had left with Mr. Manubolu

for the hospital with the understanding that he would procure a blood sample.  Even when Ranger Dominy was able to contact an AUSA, that AUSA did not act as if there were exigent circumstances by immediately assisting Ranger Dominy in obtaining approval for a search warrant.  Instead, at 3:53 a.m., AUSA McCormack attempted to contact AUSA Silver, who was not able to connect with Ranger Dominy until 4:45 a.m., almost an hour later.

The Supreme Court observed in *McNeely* that "[t]he Federal Rules of Criminal Procedure were amended in 1977 to permit federal magistrate judges to issue a warrant based on sworn testimony communicated by telephone."  569 U.S. at 154.  The *McNeely* Court also observed that "[a]s amended, the law now allows a federal magistrate judge to consider 'information communicated by telephone or other reliable electronic means.'"  *Id.* (quoting FED. R. CRIM. P. 4.1).  Furthermore, although the Court agrees that search warrant applications must be carefully drawn and scrupulously accurate, the circumstances justifying a blood draw in this case do not appear to be overly complicated: three people were dead as a result of a car accident and the driver not only exhibited signs of alcohol consumption, but also admitted having drunk alcohol before he began to operate the motor vehicle.  These general facts infused with appropriate detail would have most certainly given the magistrate judge probable cause to approve the warrant for drawing the driver's blood to test for alcohol.  Here, if the on-duty AUSAs had answered the call, treated the need for a warrant as urgent, diligently set about preparing an application for a search warrant, located and placed a magistrate judge on notice of an anticipated phone call, and if it

43

had then turned out that the process, quickly started and aggressively pursued, was taking so much time that any blood sample ultimately collected would be unusable, the case would be different.

When Ranger Dominy finally reached AUSA Silver, the blood draw had already occurred.  Furthermore, testimony at the suppression hearing revealed an involved process for getting an after-hours warrant, which involved Ranger Dominy returning to his office, drafting an affidavit, and sending it to the AUSA, who then drafted a warrant application, sent it back to Ranger Dominy, and then finally submitted it to the Magistrate Judge.  The Government did not elicit any explanation for why a simpler and less time-intensive process would not have sufficed.  It does not strike the Court that drafting a probable cause affidavit or warrant application in a simple OUI case and then transmitting it to the magistrate judge should require as much time as the Government seems to suggest.

The Court recognizes that the process for obtaining a search warrant must be a deliberate one.  But the time it takes to obtain a warrant through a process the USAO itself controls cannot serve as a de facto end run around *McNeely's* holding that the dissipation of alcohol in the blood does not alone constitute a per se exigency.  *See McNeely*, 569 U.S. at 155-56.  If the process the USAO puts in place means that an officer will never (or very rarely) be able to secure a warrant before evidence of intoxication has disappeared or become unreliable,[15] then there will always be

---

[15]    Though the Government asserts that the time it would have taken to get a warrant would have meant that evidence of Mr. Manubolu's intoxication would have been destroyed, *Gov't's Resp.* at 6, the Court is not sure why that should be the case.  Beyond the mere fact of the Government's assertion, there is no evidence in the record that the speculative length of time it would have taken to get a

exigent circumstances and *McNeely* is irrelevant. This is even more so the case when, as here, the USAO does not adhere to its own process by ensuring that an on-call AUSA is available.[16]

---

warrant would have irretrievably destroyed evidence of Mr. Manubolu's intoxication. The Government points to Mr. Manubolu's claims of how long it had been since his last drink. *Id.* But it strikes the Court as odd and unlikely that officers evaluating whether a warrant was necessary would credit an OUI suspect's self-report about his drinking over their own observations of him. Additionally, Officer Hardy testified that in a similar recent case in which he and fellow officers opted to get a warrant, the process took five hours. *Suppression Hr'g* at 82:01-04. Officer Hardy did not indicate that this length of time posed a problem, suggesting to the Court that he, at least, did not believe that the time required to get a warrant meant that exigent circumstances existed.

[16]     The Court does not regard this reasoning as incompatible with *Kentucky v. King*, 563 U.S. 452 (2011). In that case, decided before *McNeely*, the Supreme Court held that "[w]here . . . the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed." *King*, 563 U.S. at 462. First, *King* deals with the scenario where officers knock and announce their presence, hear the sound of movement inside, indicating the possible destruction of evidence, and then enter the home without a warrant to prevent that destruction. If the officer did not hear noises suggesting evidence was potentially being destroyed, the officer would not be faced with exigent circumstances allowing him or her to make a warrantless entry. The creation of exigent circumstances under *King*, in other words, rests with the person on the other side of the door from the officer. The circumstances leading to the creation of exigent circumstances may have been set in motion by the officer, but the exigent circumstances themselves are not his or her own creation. That is not the case here, where the Government can design (and seemingly has done so) a warrant procurement procedure that makes it functionally impossible—or at least very difficult—to obtain a warrant before the alcohol in an individual's blood dissipates, at least according to the Government's unsupported estimates. The Government argues in this case that the time it would have taken to get a warrant rendered the circumstances exigent, but it does not point to any specific factors about this case suggesting that in any other early morning crash, compliance with the warrant requirement would be possible. In fact, in this case, the USAO was contacted within half an hour of law enforcement first responding to the accident site. It is difficult to imagine the USAO being contacted more quickly than that, and yet the Government nonetheless contends that "[i]n the time it would have taken law enforcement officers to draft a warrant, have it reviewed by a prosecutor, and finally by a judge, the evidence of [Mr. Manubolu's] impairment would have been destroyed." *Gov't's Resp.* at 6. In effect, by pointing to the time it takes to get a warrant under the Government's own policy in what strikes the Court as a fairly ordinary case of an early-morning crash, the Government is asking the Court to put its imprimatur on a per se exigency of the sort rejected in *McNeely*.

Second, the Court is not asserting that because the USAO's warrant procurement policy may have contributed to any exigency that existed, the Government could not in any circumstances rely on the exigent circumstances exception. Rather, the Court is looking at "the totality of the circumstances," *McNeely*, 569 U.S. at 156, and finding the Government's arguments about the time it would have taken to get a warrant less convincing than it otherwise might because (A) the Government controlled, to a significant extent, the length of that process and (B) the on-call AUSAs' failure to answer the phone both greatly extended the process for getting a warrant and also suggests that the Government did not consider the incident particularly urgent. If the Government had provided more explanation for why the officers at the scene could not or did not pursue a warrant, the Court might have ruled differently.

Given the prompt arrival of EMTs and the fact that Mr. Manubolu's passengers were dead by the time of the EMTs' arrival, according to Officer Hardy, the Government cannot demonstrate a pressing health or safety need "that would take priority over a warrant application." *Mitchell*, 139 S. Ct. at 2537.

Additionally, the Government's contention that pursuing a warrant would have taken too long is not sufficient to demonstrate a specific law enforcement need under *Mitchell* where there is no evidence that the officers on the ground made any concerted or urgent effort to obtain a warrant prior to drawing Mr. Manubolu's blood and the evidence suggests that this is because those officers were relying, erroneously, on 29-A M.R.S. § 2522.

The Court concludes that, based on the factual record, the Government has not carried its burden to demonstrate that this was a "drunk-driving investigation[] where police officers [could not] reasonably obtain a warrant before a blood sample [could] be drawn without significantly undermining the efficacy of the search . . .." *McNeely*, 569 U.S. at 152.  The Court holds that the totality of the circumstances do not support a finding that exigent circumstances existed in this case justifying the warrantless blood draw.

---

In any event, even if *King* forecloses the Court from considering whether the Government was in some ways responsible for the length of time it would have taken to get a warrant—which the Court does not believe it does—the Court finds that, for all of the other reasons it has laid out, the Government still has not carried its burden to show exigent circumstances.

## IV.    CONCLUSION

The Court GRANTS Praneeth Manubolu's Motion to Suppress (ECF No. 40).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 10th day of August, 2020